UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL I. WILLENSKY,

                              Plaintiff,

         -v-

SAMUEL LEDERMAN, LEDCO
MANAGEMENT, INC., and JORADA
MANAGEMENT, INC.,

                              Defendants.

Case No. 13-CV-7026 (KMK)

OPINION AND ORDER

Appearances:

Paul I. Willensky
Goldens Bridge, NY
*Pro se Plaintiff*

Jonathan James Ross, Esq.
Caplan & Ross, LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Pro se Plaintiff Paul I. Willensky filed the instant shareholder derivative action against

Defendant Samuel Lederman ("Lederman"), and Defendant corporations Ledco Management,

Inc. ("Ledco") and Jorada Management, Inc. ("Jorada"), alleging fraud, breach of fiduciary duty,

and other misconduct.  Before the Court is Defendants' Motion to Dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6), which asserts that Plaintiff's claims are time-barred, and

Plaintiff's Motion for Leave To File [an] Amended Complaint ("Motion To Amend").  For the

following reasons, the Court grants Defendants' Motion To Dismiss and denies Plaintiff's

Motion To Amend.

## I.  BACKGROUND

### A.  Factual Background

The majority of Plaintiff's allegations concern his relationship with Defendant Lederman. In each of October 1983 and January 1984, Plaintiff paid $25,000 to Lederman in exchange for a 50% share and directorship of both Ledco and Jorada, companies engaged "in the business of managing recording and performing artists."  (*See* Am. Compl. (April 22, 2014) ¶¶ 13, 29–31 (Dkt. No. 17).)[1]  Defendant Lederman was president, director, and a 50% shareholder of both companies.  (*See id.*)  At the time of Plaintiff's investment, Lederman allegedly represented to Plaintiff that he managed artists Ian Hunter, Mick Ronson, Mike Kehr, Don Kehr, and Yul Vaz through his role in a "predecessor entity," Cleveland Entertainment Company, Inc. ("Cleveland").  (*Id.* ¶¶ 1–2.)  The crux of Plaintiff's claim is that, after Plaintiff's investment,

---

[1] Plaintiff attached a proposed Amended Complaint to his Motion To Amend.  (*See* Pl.'s Mot. for Leave To File [an] Am. Compl. (Apr. 22, 2014) ("Mot. To Amend") (Dkt. No. 17).)  Plaintiff refers to the attachment as a "comparison copy of the section of the Amended Complaint that shows the changes to the original Complaint," (*id.* at unnumbered 4), but it seems to be a complete version of his Amended Complaint because it contains all of the same sections as Plaintiff's original Complaint, and is one page longer, (*compare* Compl. (Oct. 3, 2013) (Dkt. No. 1), *with* Mot. To Amend at unnumbered 7–20 (Amended Complaint).)  While Plaintiff did not file his Motion To Amend until after Defendants filed their Reply, (*see* Reply Mem. (Apr. 18, 2014) (Dkt. No. 15)), Defendants acknowledged in their Reply that they had received a proposed Amended Complaint from Plaintiff dated April 4, 2014, (*id.* at 4), and they argued that amendment was futile because the claims in the Amended Complaint were still time-barred, (*id.* at 4–5).  Therefore, for purposes of deciding Defendants' Motion, the court treats Plaintiff's proposed Amended Complaint as the operative Complaint in this Action.

Additionally, Docket Numbers 16 and 17 appear to refer to the same Motion, except that the Motion filed as Docket Number 16 omits page 9 of the Amended Complaint.  (*Compare* Dkt. No. 16 at 8–10, *with* Dkt. No. 17 at 9.)  The Court therefore treats Docket Number 17 as the operative Amended Complaint.

Finally, while the Amended Complaint refers to the Parties using capitalize letters, the Court will change Party names to lowercase letters in accordance with the Court's style.

"Lederman . . . divert[ed] all future revenue streams" from Ledco and Jorada to himself, "engaging in a fraudulent transfer for his sole benefit."  (*Id.* ¶ 62.)

Plaintiff alleges that the "primary inducement" for his investment in Ledco and Jorada was Lederman's promise that "existing revenue streams" from Lederman's management of "Ronson and Hunter" would be "carried over" to Ledco and Jorada.  (*Id.* ¶¶ 2, 18.)[2]  Plaintiff later "ascertained that no formal contracts with Ronson or Hunter existed, . . . [and that] the ongoing revenues . . . did not exist or existed in such a way that only . . . Lederman benefited." (*Id.* ¶ 5.)  Plaintiff alleges that he determined the true nature of his arrangement with Lederman, at least in part, based on a 2006 federal lawsuit that Lederman pursued against, inter alia, Popovich Music Group Ltd. and its president, Stephen Popovich, from which Plaintiff alleges Lederman obtained a favorable judgment that included "residual value" from "'carry[-]over clients'" like Ronson and Hunter, revenues which "never accrued to Ledco." (*Id.* ¶¶ 18–19.)[3]

Additionally, Plaintiff alleges that in late 1984, nearly a year after he made his second investment, Ledco "entered into a management contract . . . with the band members of Urgent," but Lederman structured the contract such that it was "for the exclusive management services of Lederman [so that] at any time during the contract[,] unbeknownst to Plaintiff, . . . Lederman could walk away with Urgent, and Plaintiff[']s . . . Ledco shares would be worthless."  (*Id.* ¶ 4.)

---

[2] Plaintiff also suggests that, to induce Plaintiff's investment, Lederman "represented that management contracts had been specifically prepared by counsel, and agreed to, awaiting signatures by Jim Steinman [and] Niles Rodgers," contracts from which Plaintiff stood to benefit, but which did not, according to Plaintiff, exist "as represented."  (Am. Compl. ¶ 3.)

[3] Plaintiff alleged, in a separate letter to the Court, that while Lederman represented to Plaintiff that Cleveland "was a closed entity as of the investment date," "[i]t appears that . . . [it] w[as] not dissolved or liquidated, because . . . Defendant continues to reap . . . rewards" from Cleveland.  (Letter from Plaintiff to Court (Nov. 27, 2013) ("Pl.'s Nov. 27, 2013 Letter") at unnumbered 2 (Dkt. No. 6).)

Urgent's album was "reissue[d]" in 2011, and included four songs by Hunter and Ronson, but Plaintiff alleges that he never received "a commission or fee." (*Id.* ¶ 21.)

Plaintiff also alleges that, over the course of his investment, Lederman "failed to perform [the] duties imposed upon him as director and officer of Defendant corporations" because he did not "give care or oversight to the business and affairs of the . . . corporations in a skillful, careful and diligent manner, but to the contrary neglected, suffered, and permitted monies, properties and effects of said . . . corporations to be taken, wasted, and squandered" to pay for "personal costs[] and obligations incurred prior to [P]laintiff[']s investment," including "management fees earned from royalties, performance fees, and production work[,] all of which did not flow through Ledco." (*Id.* ¶¶ 8–9.) Plaintiff alleges that the reason Lederman commingled his assets with those of Ledco and "converted all cash and revenues to his own benefit" was that, "[a]t the time of Plaintiff's . . . investment, all of . . . Lederman's economic entities were defunct or in dire need of a cash infusion[,] [and so] Plaintiff . . . provided that financial lifeboat through the years of 1983 and 1984." (*Id.* ¶¶ 10, 23.) Additionally, Plaintiff avers that Lederman "breached his employment agreement as President of . . . Defendant corporations" because instead of "devot[ing] his full time and energies to the business of said corporations," he "devoted himself to selling municipal bonds for [another individual] . . . using the offices, equipment[,] and staff of the [D]efendant corporations . . . for his personal profit," which "alienated concert hall owners/promoters and record company personnel . . . whose goodwill was critical to the success of Defendant . . . corporations." (*Id.* ¶ 11.) Plaintiff also alleges that Lederman, in his capacity as president, "failed to cause the Defendant corporations to [provide] financial reports[] and tax returns to its shareholder[s]," (*id.* ¶ 12), and that he "failed to disclose . . . accounting issues" faced by Ledco "with due candor," (*id.* ¶ 20).

With regard to the other named Defendants, Plaintiff alleges that the Ledco Board of Directors, because of its "position[] of control and authority" and "advisory, executive, managerial, and directorial" functions, "had knowledge of material non-public information regarding the company," yet failed to "discharge [its] dut[y]."  (*Id.* ¶¶ 33, 34.)  In particular, Plaintiff alleges that the Board failed to "exercise reasonable and prudent supervision over the management, policies, practices[,] and controls of the Company," including "taking appropriate action to correct . . . misconduct and prevent its recurrence."  (*Id.* ¶ 34.)  Presumably, this allegation also applies to the Board of Directors of Jorada, though Plaintiff does not explicitly make such an allegation in his Amended Complaint.

B.  Procedural History

Over two decades before filing the instant Action, on December 4, 1989, Plaintiff filed a lawsuit in New York Supreme Court against Defendants Lederman, Ledco, and Jorada, as well as one additional defendant, alleging fraud, misconduct, and breach of fiduciary duty.  (*See* Decl. of Jonathan J. Ross, Esq. in Supp. of Defs.' Mot. To Dismiss ("Ross Decl.") (Mar. 3, 2014) Ex. B (Dkt. No. 13) (New York Supreme Court complaint); *see also* Letter from Plaintiff to Court (Nov. 27, 2013) ("Pl.'s Nov. 27, 2013 Letter") at unnumbered 1 (Dkt. No. 6) (noting that "[in] 1990 . . . Plaintiff filed a shareholder derivative lawsuit against Samuel Lederman[,] et al. for fraud").)[4]  The lawsuit was based on similar facts to those alleged in the instant case.  (*See* Mem. of Law in Opp'n to Defs.' Mot. To Dismiss (Mar. 31, 2014) ("Opp'n") 4 (Dkt. No. 14) ("The Plaintiff . . . does not dispute that a preliminary lawsuit was filed in 1990, and the facts are

---

[4] The Parties refer to this lawsuit as filed in 1990.  (*See, e.g.,* Pl.'s Nov. 27, 2013 Letter at unnumbered 1; Mem. of Law in Supp. of Defs.' Motion To Dismiss (Mar. 4, 2014) (Defs.' Mem.") 3, 9 (Dkt. No. 12).)  While the record makes clear that the lawsuit was filed in late 1989, rather than in 1990, the precise date of its filing has no impact here.

similar . . . .").  On March 16, 1990, the Supreme Court dismissed Plaintiff's lawsuit.  (*See* Ross

Decl. Ex. C (docket sheet).)[5]

Plaintiff filed the instant Action on October 3, 2013, alleging several causes of action,

including "fraudulent transfer," "fraud and conspiracy to commit fraud," "conversion," and

"breach of fiduciary duty."  (*See* Compl. 8–11 (Dkt No. 1).)[6]  Plaintiff alleged that, as a result of

Defendants' actions, he suffered "serious harm and damage," because he was "depriv[ed] . . . of

profits which [the Defendant corporations] would have generated," though Plaintiff admits that

"the amount[] of damages and profits can be ascertained only upon an accounting review."  (*Id.*

¶ 14.)  Plaintiff therefore sought injunctive relief and damages, including requests that his assets

be returned and held in a "constructive trust," that any transfer of funds from Ledco and Jorada

to Lederman "be declared void," and that he be granted a "full accounting of all monies received

from . . . sales, transfers, as well as other assets taken, and converted by . . . Lederman."  (*See id.*

¶¶ 41, 45, 50, 55, 58, 62, 64.)

The Parties stipulated to a two-week extension of time for Defendants to file an answer,

(*see* Dkt. No. 7), and Defendants thereafter, in a letter dated November 26, 2013, requested a

pre-motion conference for their Motion To Dismiss, (*see* Dkt. No. 8).  Plaintiff responded in a

---

[5] Though the record does not indicate on what basis the case was dismissed, Plaintiff alleges that the dismissal was without prejudice.  (*See* Pl.'s Nov. 27, 2013 Letter at unnumbered 1.)  Defendants, in fact, in their most recent letter to the Court, asserted that Plaintiff "voluntarily discontinue[ed] the . . . action."  (*See* Letter from Brian D. Caplan, Esq., to Court (Dec. 19, 2014) at unnumbered 2 (Dkt. No. 21).)

[6] Plaintiff alleges that he made no demands on the Ledco and Jorada Boards of Directors because they would be futile.  (Am. Compl. ¶ 15.)  Plaintiff argues that Lederman "was to represent the majority of both boards and personally participated in, performed, authorized[,] and approved the acts and transactions complained of herein," and the directors and officers of both companies "are Defendants in this action," meaning none of them could "be expected to vote to prosecute an action against themselves."  (*Id.*)

letter dated November 27, 2013.  (*See* Pl.'s Nov. 27, 2013 Letter.)  At the pre-motion conference,

held on January 29, 2014 and attended by Plaintiff, the Court adopted a scheduling order

whereby Defendants would file their motion by March 3, 2014, Plaintiff would file his

opposition by April 4, 2014, and Defendants would file their reply by April 18, 2014.  (*See* Dkt.

(minute entry for Jan. 29, 2014).)  Defendants filed their Motion To Dismiss, Memorandum of

Law, and Declaration on March 4, 2014.  (Dkt. Nos. 11–13.)[7]  Plaintiff filed his Opposition on

March 31, 2014.  (*See* Dkt. No. 14).  Defendants filed their Reply on April 18, 2014.  (Dkt. No.

15).  On April 22, 2014, Plaintiff filed his Motion to Amend, attaching his proposed Amended

Complaint.  (Dkt. No. 17.)

On December 5, 2014, the Court ordered letter briefing on the applicability of New

York's "open repudiation doctrine" to Defendants' Motion to Dismiss.  (*See* Dkt. No. 18.)  *See*

*also Bd. of Trustees ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*, No. 11-CV-6345, 2012

WL 3930112, at *9 (S.D.N.Y. Sept. 10, 2012) (describing this doctrine).  Plaintiff filed his letter

brief on December 18, 2014, (Dkt. No. 23), and Defendants filed their letter brief on December

19, 2014, (Dkt. No. 21).

## II.  DISCUSSION

A.  <u>Standard of Review</u>

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient

facts which, taken as true, state a plausible claim for relief."  *Keiler v. Harlequin Enters. Ltd.*,

751 F.3d 64, 68 (2d Cir. 2014).  The Supreme Court has held that "[w]hile a complaint attacked

by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

---

[7] Defendants attempted to file their Motion on March 3, 2014, but due to a filing error they had to refile the next day.  (*See* Dkt. No. 10 (noting deficient docket entry).)

obligation to provide the 'grounds' of his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (third alteration in original) (citations omitted). Instead, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))). Where, as here, the complaint was filed pro se*, it must be construed liberally with "special solicitude" and interpreted to raise the strongest claims that it suggests. *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted).

In considering Defendants' Motion To Dismiss, the Court "accept[s] all factual allegations as true and draw[s] every reasonable inference from those facts in the plaintiff's favor." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (internal quotation marks omitted); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's

favor." (internal quotation marks omitted)).  Generally, "[i]n adjudicating a Rule 12(b)(6)

motion, a district court must confine its consideration to facts stated on the face of the complaint,

in documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*,

199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).  In deciding a motion to

dismiss a pro se complaint, however, it is appropriate to consider "materials outside the

complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah

v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal

quotation marks omitted); s*ee also Walker v. Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013)

(noting that a court may consider "factual allegations made by a pro se party in his papers

opposing the motion"); *Rodriguez v. Rodriguez*, No. 10-CV-891, 2013 WL 4779639, at *1

(S.D.N.Y. July 8, 2013) ("Although the Court is typically confined to the allegations contained

within the four corners of the complaint, when analyzing the sufficiency of a pro se pleading, a

court may consider factual allegations contained in a pro se litigant's opposition papers and other

court filings.") (citations and internal quotation marks omitted); *Agu v. Rhea*, No. 09-CV-4732,

2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (noting that a court may consider

"documents that a pro se litigant attaches to his opposition papers").

     Additionally, although "[t]he lapse of a limitations period is an affirmative defense that a

defendant must plead and prove[,]" a statute of limitations defense may be "raise[d] . . . in a pre-

answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Staehr v.

Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *see also Vasconcellos v. City

of New York*, No. 12-CV-8445, 2014 WL 4961441, at *2 (S.D.N.Y. Oct. 2, 2014) (same).

"[B]ecause the defendants bear the burden of establishing the expiration of the statute of

limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) (internal quotation marks omitted).

    B.  <u>Analysis</u>

       1.  <u>Timeliness</u>

Defendants move to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6), arguing they are "barred by the statute of limitations."  (Mem. of Law in Supp. of Defs.' Motion To Dismiss (Mar. 4, 2014) ("Defs.' Mem.") 1–3 (Dkt. No. 12).)  In support of their Motion, Defendants assert that the action that Plaintiff filed in New York Supreme Court in 1989 demonstrates that he had "notice of the accrual of his claims" at that time.  (*Id.* at 5.) Defendants also argue that any dismissal "should be with prejudice and without leave to amend" because amendment would be futile.  (*Id.* at 9–10.)

    "Where jurisdiction rests upon diversity of citizenship," as it does here, (*see* Am. Compl. ¶ 26 (asserting jurisdiction is proper on diversity grounds)), "a federal court sitting in New York must apply New York choice-of-law rules and statutes of limitations."  *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626–27 (2d Cir. 1998).  In New York, an "action by or on behalf of a corporation against a present or former director . . . for an accounting, or to procure a judgment on the ground of fraud, or to enforce a liability, penalty[,] or forfeiture, or to recover damages for waste . . . or for an accounting in conjunction therewith," is subject to a six-year statute of limitations.  N.Y. C.P.L.R § 213(7); *see also Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 & n.5 (2d Cir. 2001) ("The statute of limitations in New York for claims of unjust enrichment, breach of fiduciary duty, corporate waste, and for an accounting is generally six

years." (citing N.Y. C.P.L.R §§ 213(1), (7))); *Roslyn Union Free Sch. Dist. v. Barkan*, 950

N.E.2d 85, 88 (N.Y. 2011) (noting that N.Y. C.P.L.R. § 213(7) "extends the limitations period"

for actions for "monetary damages for injury to property" to six years in the circumstances

outlined in the statute).  For actions based upon fraud, "the time within which the action must be

commenced shall be the greater of six years from the date the cause of action accrued or two

years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence

have discovered it."  N.Y. C.P.L.R. § 213(8); *see also Cohen v. S.A.C. Trading Corp.*, 711 F.3d

353, 361 & n.3 (2d Cir. 2013) ("Under New York law, claims of common law fraud and breach

of fiduciary duty based on fraud are generally subject to six-year statutes of limitations." (citing

N.Y. C.P.L.R § 213(8) in the accompanying footnote)); *Sargiss v. Magarelli,* 909 N.E.2d 573,

576 (N.Y. 2009) ("With respect to the timeliness of [the] plaintiff[']s action, a fraud-based action

must be commenced within six years of the fraud or within two years from the time the plaintiff

discovered the fraud or 'could with reasonable diligence have discovered it.'" (citing N.Y.

C.P.L.R § 213(8))).  For actions where no other limitation is prescribed, the statute of limitations

also is six years.  N.Y. C.P.L.R § 213(1); *see also Caronia v. Philip Morris USA, Inc.*, 715 F.3d

417, 423 (2d Cir. 2013) (noting that N.Y. C.P.L.R. § 213(1) provides the applicable statute of

limitations in "actions seeking equitable relief, including injunctive relief, or [in] actions for

which no limitations period is specified") (citation omitted); *Melcher v. Greenberg Traurig,*

*LLP*, 11 N.E.3d 174, 175 (N.Y. 2014) (noting that N.Y. C.P.L.R. § 213(1) is a "'catch-all' or

residual provision" which provides a six year statute of limitations for actions which have no

other limitations period proscribed by law).  Therefore, with the exception of Plaintiff's

conversion claim, which is subject to a three-year statute of limitations, N.Y. C.P.L.R § 214(3);

*SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 181 (2d Cir. 2000); *State v. Seventh*

11

*Regiment Fund, Inc.*, 774 N.E.2d 702, 709 (N.Y. 2002), Plaintiff's claims are governed by a six-year statute of limitations under New York law.[8]

Plaintiff does not contest that his claims are subject to a six-year statute of limitations. Indeed, Plaintiff appears to recognize that, absent a tolling of the statutes of limitations, his claims are time-barred, as he does "not dispute that [he filed] a preliminary lawsuit . . . in 1990 [wherein] the facts [were] similar." (Opp'n 4.) Plaintiff instead seeks tolling of the statute of limitations based on "special circumstances which would make the operation of the statute of limitations unfair," namely that "[Plaintiff] [was] unaware of [his] cause of action." (*Id.* at 6.)

---

[8] Notably, in New York, "the internal affairs of a corporation are governed by the law of the state of incorporation." *Hilton Head Holdings b.v. v. Peck*, No. 11-CV-7768, 2012 WL 613729, at *6 (S.D.N.Y. Feb. 23, 2012); *see also Culligan Soft Water Co. v. Clayton Dubilier & Rice LLC*, 988 N.Y.S.2d 134, 136 (N.Y. App. Div. 2014) (describing the "internal affairs" doctrine as "recognize[ing] that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders" (internal quotation marks omitted)). In this case, Defendant Corporations were citizens of New Jersey, (Defs.' Mem. 6), so New Jersey law applies to any claims implicating their internal affairs. Even if New Jersey substantive law governs some or all of Plaintiff's claims, though, no New York court has held that the internal affairs doctrine requires that it apply the *statutes of limitations* of a defendant corporation's home state. *See Aboushanab v. Janay*, No. 06-CV-13472, 2007 WL 2789511, at *4 n.2 (S.D.N.Y. Sept. 26, 2007) (noting that the internal affairs doctrine is not an exception to statute of limitations principles); *Baena v. Woori Bank*, No. 05-CV-7018, 2006 WL 2935752, at *6, *8 (S.D.N.Y. Oct. 11, 2006) (rejecting claim that Korean law should be applied under the internal affairs doctrine, noting that "[n]o New York court has accepted the 'internal affairs' doctrine as an exception to traditional statute of limitation principles"); *cf. Normal v. Elkin*, No. 06-CV-005, 2007 WL 2822798, at *3 (D. Del. Sept. 26, 2007) (noting that the Delaware internal affairs doctrine applies only to substantive issues, and therefore because the "statute of limitations is a procedural issue . . . . the doctrine is not applicable"). Moreover, even if the Court did apply New Jersey's statutes of limitations, Plaintiff would still have only six years to file his claims. *See* N.J. Stat. Ann. § 2A:14-1 ("Every action at law for trespass to real property, for any tortuous injury to real or personal property, for taking, detaining, or converting personal property, . . . or for recovery upon a contractual claim or liability . . . shall be commenced within [six] years next after the cause of any such action shall have accrued."); *see also Klumpp v. Borough of Avalon*, 202 N.J. 390, 407 (N.J. 2010) (recognizing that this statute provides a "six-year limitations period for trespass and injures to real property").

Plaintiff contends that he did not discover the full scope of Defendants' actions until recently, and that therefore the statute of limitations should not have begun to run until he made that discovery.  (*See id.* at 4, 7.)  Construing this argument liberally, it appears that Plaintiff seeks either equitable tolling or an application of the "open repudiation" doctrine under New York State law.[9]

### a. Equitable Tolling

Plaintiff's state law claims are governed by New York's equitable tolling doctrine.  *See Statistical Phone Philly v. NYNEX Corp.,* 116 F. Supp. 2d 468, 482 (S.D.N.Y. 2000) (noting that "the state law of equitable tolling governs [the] plaintiffs' state law claims").[10]  That doctrine

---

[9] The Court treats any new allegations contained in Plaintiff's Opposition pertaining to equitable tolling as part of Plaintiff's pleadings, because, as discussed above, where new allegations in a pro se plaintiff's opposition memoranda "are consistent with the allegations contained" in the Complaint, they may be read "as supplements to th[e] pleadings."  *Boyer v. Channel 13, Inc.,* Nos. 04-CV-2137, et al., 2005 WL 2249782, at *6 (S.D.N.Y. Mar. 9, 2005); *see also Paul v. Bailey,* No. 09-CV-5784, 2013 WL 2896990, at *5 (S.D.N.Y. June 13, 2013) (considering "factual allegations made by pro se [p]laintiff in [the plaintiff's] opposition papers" because they were "consistent with those in the initial complaint and amended complaints" (italics omitted)); *Gertskis v. U.S. E.E.O.C.,* No. 11-CV-5830, 2013 WL 1148924, at *1 (S.D.N.Y. Mar. 20, 2013) (considering allegations from the plaintiff's opposition memoranda "to the extent they are consistent with the [a]mended [c]omplaint"); *Chukwueze v. NYCERS,* 891 F. Supp. 2d 443, 448 (S.D.N.Y. 2012) ("[B]ecause a pro se plaintiff's allegations must be construed liberally[,] it is appropriate for a court to consider factual allegations made in a pro se plaintiff's opposition memorandum, as long as the allegations are consistent with the complaint." (italics omitted)).

[10] The Court notes that under New York law, the "doctrines of equitable estoppel and fraudulent concealment are analyzed in the same manner."  *Statistical Phone Philly v. NYNEX Corp.,* 116 F. Supp. 2d 468, 484 (S.D.N.Y. 2000).  The Court therefore relies on cases that refer to both New York law doctrines.
   Additionally, the Court notes that Plaintiff cites only federal cases in support of his equitable tolling argument, referencing "the discovery rule" and "adverse domination theory." (*See* Mem. of Law in Opp'n to Defs.' Mot. To Dismiss (Mar. 31, 2014) ("Opp'n") 5–8 (Dkt. No. 14).)  While the "adverse domination theory" does not apply here because it is only applicable to corporate plaintiffs, *see F.D.I.C. v. Dawson,* 4 F.3d 1303, 1308 (5th Cir. 1993), insofar as Plaintiff makes any claims based on "federal violations," (Pl.'s Nov. 27, 2013 Letter at unnumbered 3), the federal doctrine of equitable tolling, which "is similar, but not identical," to

"applies where it would be unjust to allow a defendant to assert a statute of limitations defense,"

because "the defendant's affirmative wrongdoing . . . produced the long delay between the

---

state law equitable estoppel, applies. *Astor Holdings, Inc. v. Roski*, No. 01-CV-1905, 2002 WL 72936, at \*15 (S.D.N.Y. Jan. 17, 2002); *see also Cary Oil Co., Inc. v. MG Refining and Marketing, Inc.*, 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000) ("The doctrine of equitable tolling . . . is federal in nature and does not apply to claims based solely on New York law.  New York, however, recognizes the related but not identical doctrine of equitable estoppel, which bars a defendant from pleading the statute of limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." (internal quotation marks omitted)).

   "The federal doctrine of equitable tolling was developed in the context of actions based upon fraud," and is "invoked in cases where the plaintiff is ignorant of his cause of action because of the defendant's fraudulent concealment." *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 49–50 (2d Cir. 1985).  It is only available "in rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights." *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (alterations, citations, and internal quotation marks omitted).  In these circumstances, "the statute of limitations does not begin to run until the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice," *Statistical Phone Philly*, 116 F. Supp. 2d at 482 (internal quotation marks omitted); *see also Iavorski v. U.S. I.N.S.,* 232 F.3d 124, 129 (2d Cir. 2000) ("A statute of limitations may be tolled as necessary to avoid inequitable circumstances" where "as a matter of fairness . . . a [party] has been prevented in some extraordinary way from exercising his rights" (second alteration in original) (internal quotation marks omitted)).  In other words, "the statute of limitations will be tolled if the plaintiff pleads, with particularity, the following three elements: (1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." *Statistical Phone Philly*, 116 F. Supp. 2d at 482; *see also Iavorski*, 232 F.3d at 134 ("In a situation where fraud or concealment of the existence of a claim prevents an individual from timely filing, equitable tolling of a statute of limitations is permitted until the fraud or concealment is, or should have been, discovered by a reasonable person in the situation."); *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993) ("Equitable tolling will stay the running of the statute of limitations only so long as the plaintiff has exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." (internal quotation marks omitted)).  It is Plaintiff's burden to establish, according to these standards, that the applicable statute of limitations should be tolled. *See Wultz v. Bank of China Ltd.*, No. 11-CV-1266, 2013 WL 1641179, at \*1 (S.D.N.Y. Apr. 16, 2013).

   Based on the same reasoning the Court applies in its consideration of the state equitable tolling argument—that Plaintiff had notice of his claims, and filed suit making those claims 25 years ago—the Court finds that Plaintiff's claims are also not deserving of federal equitable tolling.

accrual of the cause of action and the institution of the legal proceeding." *Zumpano v. Quinn*, 849 N.E.2d 926, 929 (N.Y. 2006). Therefore, "[i]t is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations[,] or deception to refrain from filing a timely action." *Simcuski v. Saeli*, 377 N.E.2d 713, 716 (N.Y. 1978); *Putter v. North Shore Univ, Hosp.*, 858 N.E.2d 1140, 1142 (N.Y. 2006) ("We have recently reaffirmed that equitable estoppel will preclude a defendant from using the statute of limitations as a defense where it is defendant's affirmative wrongdoing . . . which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." (alteration in original) (internal quotation marks omitted)). Additionally, "concealment without actual misrepresentation may form the basis for invocation of the doctrine if there was a fiduciary relationship which gave [the] defendant an obligation to inform [the] plaintiff of facts underlying the claim." *Doe v. Holy See (State of Vatican City)*, 793 N.Y.S.2d 565, 568 (N.Y. App. Div. 2005) (alterations in original) (internal quotation marks omitted). It is the Plaintiff's burden "to establish facts entitling him to equitable tolling." *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 187 (E.D.N.Y. 2010) (citing *Simcuski*, 377 N.E.2d at 716); *see also Putter*, 858 N.E.2d at 1142 ("A plaintiff seeking to apply the doctrine of equitable estoppel must establish that subsequent and specific actions by defendants somehow kept [him or her] from timely bringing suit." (alteration in original) (internal quotation marks omitted)); *Zumpano*, 849 N.E.2d at 929 ("It is therefore fundamental to the application of equitable estoppel for [the] plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing the suit."); *Doe*, 793 N.Y.S.2d at 568 ("In opposition to [the] defendants' motions to dismiss upon the affirmative defense, it was incumbent upon [the] plaintiffs to come forward with facts in support of equitable estoppel."). Plaintiff must also establish "[d]ue diligence . . . in

bringing [his] action . . . within a reasonable time after the facts giving rise to the estoppel have ceased to be operational." *Doe*, 793 N.Y.S.2d at 569 (internal quotation marks omitted).

While the majority of the misconduct Plaintiff alleges occurred in the mid-1980s, Plaintiff contends that "recently discovered information has changed the nature of the case, and its underlying allegations." (Opp'n 4.) Plaintiff argues that he was previously unaware that "[t]here continues to be ongoing compensation with regard to Hunter, Ronson, and the members of Urgent . . . . ," as well as other revenue streams, "that ha[ve] never been documented by . . . [Lederman] nor distributed to . . . Plaintiff." (Opp'n 6; *see also* Pl.'s Nov. 27, 2013 Letter at unnumbered 1–2 (discussing "ongoing business activity that was unreported to the Plaintiff," including the fact that "in 1994[,] Lederman was [an] Executive Producer on Ronson's *Heaven & Hell* album, [Hunter's] 1989 & 1995. . albums, [and the] 2002 [album] *Meatloaf & Friends*"); *id.* at unnumbered 2 (arguing that "[t]he statute of limitations does not apply for the sheer fact that [the] revenues" that Lederman derives from Ledco and Cleveland, to which Plaintiff alleges he is entitled, "continue"); *id.* (noting that "the business activities" at issue, namely Lederman's continued interest in Cleveland, "were still ongoing into 2008 and possibly beyond," meaning the statute of limitations should have been "toll[ed] until [Plaintiff] received constructive notice to the true value of his initial investment"); Am. Compl. ¶ 24 (implying that the statute of limitations should run "from the point in time that Plaintiff became knowledgeable that revenues [to which he is entitled] exist").).[11]

---

[11] Plaintiff asserts in his Amended Complaint that he nonetheless still does not know the full scope of Defendants' fraud, claiming that "[d]iscovery would be essential in putting the dots together for the ongoing fraud being perpetrated by the Defendants." (Am. Compl. ¶ 5.)

Plaintiff argues that he only became "aware of [the] ongoing fraud . . . [when] he became aware of the death of Stephen Popovich and read about multiple litigations by Defendant Lederman and others" that pertained to compensation that Plaintiff alleges he should have received for the 1984 album, "'Hits Out of Hell,'" and its "multiple" reissued versions released "between 2001 and 2009."  (Opp'n 7.)[12]  The only one of these "litigations" that Plaintiff refers to in his pleadings in any detail is Lederman's lawsuit against Popovich Music Corp. Ltd. and its president, Stephen Popovich ("Popovich") (the "Cleveland Action").[13]  (*See* Am. Compl. ¶¶ 18–19.)

The Cleveland Action consists of a lawsuit filed by Lederman and another former Cleveland shareholder on October 27, 2006 against, among others, the only other former Cleveland shareholder, Popovich, seeking the distribution of proceeds from a judgment Popovich received in a separate lawsuit related to Cleveland's recording and management agreements with Michael Aday, p/k/a "Meatloaf."  (*See* Am. Compl. ¶ 18; Defs.' Mem. 7–8; Ross Decl. Ex. D. ("Lederman Complaint") ¶¶ 19, 28–40, 43, 52, 61, 67 (complaint in *Lederman v. Popovich*, No. 07-CV-845 (N.D. Oh. Apr. 25, 2007); *id.* at 17.)  Plaintiff alleges that this lawsuit indicated (a) that, contrary to Lederman's representations to Plaintiff, Cleveland continued to exist after Plaintiff's investment, and (b) that after Plaintiff invested in Ledco and Jorada, Lederman

---

[12] Plaintiff also alleges, without explaining how these allegations have changed his claims, that Defendants "never complied with discovery[] or allowed a proper accounting examination," and that "[i]t has never been properly determined" whether Lederman was acting "in earnest" or "deceptive[ly]" when he "feigned poverty, and literally begged . . . for . . . Plaintiff to drop the State action."  (Opp'n 4.)

[13] Plaintiff makes a passing reference to lawsuits "against Columbia and Sony for compensation in part earned past 1984 for 'Hits Out of Hell[,]' on which Lederman was Executive Producer[,] . . . [and which] was released in 1983 and reissued multiple times between 2001 and 2009."  (Reply 7.)  For the same reasons discussed below, it is unclear why Plaintiff is entitled to fees for work Lederman performed prior to Plaintiff's investment.

derived a benefit from Cleveland clients, namely Ronson and Hunter, meaning Plaintiff was entitled to a portion of the revenues at issue in the Cleveland Action. (Am. Compl. ¶¶ 18–19.)

The Court finds, for the following reasons, that Plaintiff has failed to show how the Cleveland action is relevant, or disclosed information material to, the fraud that Lederman allegedly perpetrated against Plaintiff such that it had an effect on Plaintiff's ability to file his claims. First, by Plaintiff's own admission, any work Lederman performed that was relevant to the Cleveland Action, other than filing the lawsuit itself, pre-dated Plaintiff's investment in Ledco and Jorada. (*See id.* ¶ 18 (noting that the suit "related to activities prior to Plaintiff['s] . . . investment in Ledco").) Therefore, while Lederman seems to have maintained an independent interest in Cleveland as a minority shareholder even after it was dissolved in 1991, (Lederman Complaint ¶¶ 19, 39–40), the Cleveland Action does not suggest that Lederman failed to carry over clients, and their associated revenue streams, to Ledco and Jorada. As Plaintiff admits, he was only entitled to "royalties, compensation[,] and fees attributable to Lederman" "[f]rom that time" on, i.e., earnings from work Lederman performed from the date of Plaintiff's investment. (Opp'n 7.) Plaintiff therefore has no claim to compensation Lederman earned for work performed prior to Plaintiff's investment. Likewise, the fact that Lederman kept his shares in Cleveland after Plaintiff's investment in Ledco and Jorada does not suggest that Lederman violated any "exclusive *employment* agreement" he had with Plaintiff and Ledco, (*id.* at 6 (emphasis added)), given that Lederman ended his employment with Cleveland as of 1982, the year before Plaintiff's first investment, (*id.* at 7).[14]

---

[14] Plaintiff does not allege that the Lederman's maintenance of a minority stake in Cleveland presented a conflict of interest.

Second, the Cleveland Action makes no mention of Hunter or Ronson, the clients Plaintiff alleges were the "primary inducement" for his investment, (Am. Compl. ¶ 2), nor are Ledco or Jorada implicated.  While Plaintiff alleges that the carry-over clients at issue in the instant case only "included" Hunter and Ronson, (*id.* ¶ 18), implying there were other clients that Lederman should have brought to Ledco and Jorada, Plaintiff fails to allege who those clients are beyond a passing reference to "Mike Kehr, Don Kehr, [and] Yul Vaz" in the first paragraph of the Complaint, (*id.* ¶ 1).[15]  Regardless, only one client, Meatloaf, is the subject of the Cleveland Action, and Plaintiff does not allege an interest in Meatloaf, or, for that matter, in Cleveland (as a shareholder or otherwise).[16]

Third, insofar as Plaintiff alleges that the Cleveland Action demonstrated that Cleveland still existed as an entity, contrary to Lederman's representations, (*id.* ¶ 18), Plaintiff fails to

---

[15] Even if Plaintiff did list each carry-over client, Plaintiff does not explain how the transfer of a client necessarily includes the transfer of royalty rights held by a company that performed prior work for those clients.  Plaintiff does not allege that Lederman provided any additional services to Cleveland's clients after Plaintiff's investment, and Lederman was under no obligation to negotiate the transfer of Cleveland's royalty rights to Ledco and Jorada.

[16] Plaintiff does allege that, when he made his investment in 1983, he was "originally a 40% partner [in] all [of] Lederman's entities [sic], and [a] 50% owner of all of Lederman's ongoing music endeavors."  (Pl.'s Nov. 27, 2013 Letter at unnumbered 2.)  Plaintiff's argument appears to be that, rather than an allegation that he has a stake in Cleveland, Plaintiff has some right to a remittance from Cleveland's earnings: "Lederman was contractually obligated to the Plaintiff to repay the $20,000 personal loan and the $50,000 investment and remit dividends as they became available.  All [of Lederman's] efforts were contractually expected to produce Ledco compensation."  (Opp'n 6.)  This allegation makes little sense in light of Plaintiff's characterization of his agreement with Lederman as an "exclusive *employment* agreement" that entitled him to a portion of proceeds "attributable to Lederman" "[f]rom that time" on.  (*Id.* at 7 (emphasis added).)  Such an agreement does not suggest that any money that Lederman takes in, e.g., earnings from personal investments, must be shared with Plaintiff.  Rather, it only requires that any compensation Lederman obtains as a result of his *employment* be shared.  Compensation from the Cleveland lawsuit therefore falls outside the ambit of Plaintiff's agreement with Lederman.

allege how that fact affects Plaintiff's claims such that the statute of limitations should be tolled. As noted, Plaintiff does not allege an interest in Cleveland itself, and therefore it is unclear how Cleveland's mere existence and maintenance of assets is relevant, particularly given Lederman was no longer an employee—and was only a minority shareholder—at the time of Plaintiff's investment in Ledco and Jorada.

Fourth, even if the Cleveland Action were relevant such that the statute of limitations should have been tolled until the lawsuit was filed, Lederman filed the Cleveland Action in 2006. (*See* Am. Compl. ¶ 18.)  Plaintiff's claims in this Action, which was filed in October 2013, would therefore still be time-barred under New York's six-year statute of limitations.  (*See* Compl.)[17]

The Cleveland Action aside, Plaintiff has otherwise "fail[ed] to point to material facts from which a reasonable jury could conclude that [D]efendants' wrongful concealment," or any of Defendants' actions at all, "prevented [P]laintiff[] from discovering the nature of [his] claims within the limitations period."  *Statistical Phone Philly*, 116 F. Supp. 2d at 483; *see also Shared Commc'ns Servs. of ESR, Inc. v. Holdman, Sachs & Co.*, 832 N.Y.S.2d 32, 34 (N.Y. App. Div. 2007) (rejecting equitable tolling claim and noting that "there is no basis for tolling the statute of limitations" unless the plaintiff "show[s] that [he or she] was prevented from timely filing an action due to reasonable reliance . . . on deception, fraud[,] or misrepresentation by [the] defendant." (internal quotation marks omitted)); *Doe*, 793 N.Y.S.2d at 569 (rejecting equitable

---

[17] Indeed, to the extent that there was relevant information for Plaintiff to ascertain after he filed his New York Supreme Court lawsuit in 1989, it is unclear why Plaintiff's "internet investigation" failed to expose Lederman's ongoing activities, namely that "music production by artists on the Lederman, Ledco [sic] roster [was] ongoing, at least through 2002," at any prior time.  (Pl.'s Nov. 27, 2013 Letter at unnumbered 2.)

tolling claim because the "[p]laintiffs [had] not articulated any acts by [the] [d]efendants that prevented them from timely commencing suit").[18]  Therefore, because Plaintiff had notice of his claims as of the filing of his New York Supreme Court action in 1989, *see Harris v. Wilmorite Corp.*, 697 N.Y.S.2d 439, 440 (N.Y. App. Div. 1999) ("The doctrine of equitable estoppel will not apply if the plaintiff possesses timely knowledge sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the [s]tatute of [l]imitations" (internal quotation marks omitted)), and the filing of that action makes clear that Plaintiff was not "induced by . . . [D]efendant[s'] fraud, misrepresentations or deception" to delay the commencement of [his] action," *Keselman v. Webber*, 868 N.Y.S.2d 254, 255 (N.Y. App. Div. 2008), equitable tolling does not render Plaintiff's claims timely.[19]

---

[18] While Plaintiff claims that Lederman failed to "disclose the continual share ownership of Cleveland International Records . . . to the U[.]S[.] Trustee in his personal bankruptcy case," Plaintiff does not allege that this is why he did not file his lawsuit sooner.  (Pl.'s Nov. 27, 2013 Letter at unnumbered 1.)

[19] For this reason, Plaintiff also cannot argue, based on N.Y. C.P.L.R. § 213(8), that he only discovered the fraud within the last two years, and could not "with reasonable diligence have discovered it" before that time, such that his claims would be timely.  *Id.*
    Additionally, while Plaintiff does not allege that the continuing wrong doctrine applies, it nonetheless does not rescue Plaintiff's claims.  "The continuing wrong doctrine provides that, in certain cases involving continuous or repeated wrongs, the statute of limitations accrues upon the date of the last wrongful act."  *Margrabe v. Sexter & Warmflash, P.C.*, No. 07-CV-2798, 2009 WL 361830, at *7 (S.D.N.Y. Feb. 11, 2009) *aff'd*, 353 F. App'x 547 (2d Cir. 2009).  First, even if Plaintiff "adequately alleged that [he] were continuously wronged, [the Second] Circuit does not appear to recognize the doctrine."  *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 922 F. Supp. 2d 445, 467 (S.D.N.Y. 2013); *see also Curtis v. Airborne Freight Corp.*, 87 F. Supp. 2d 234, 244 (S.D.N.Y. 2000) ("As a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor.").  Second, even if the doctrine did apply, Defendants' conduct does not justify applying the doctrine because this is a contract case that involves discreet business dealings.  *Cf. Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1041 (2d Cir. 1992) (rejecting application of the continuing wrong doctrine where the "defendants entered into one discrete contract with [the] plaintiffs after which [the] plaintiffs were committed to invest a set amount of money"); *id.* at 1041 (explaining that plaintiffs could not use the continuing wrong theory for an "ongoing" violation, because "performance under [a] contract merely affects damages and does not give rise to a new cause of action"); *Quintana v.*

Plaintiff's claim for equitable tolling can, however, be construed another way.  While Plaintiff had knowledge of the fraud as of 1989, perhaps he only recently discovered its *extent*. Indeed, Plaintiff's allegations regarding Lederman's representations about the existence of Cleveland, and the fact that Lederman continued to collect from clients without providing Plaintiff with his share of the proceeds, appear to relate to the severity of the fraud, rather than its existence.  Plaintiff characterizes his claims in this way in his Opposition when he "requests that he be allowed to present his recent discoveries of *further* breach of contract and *further* fraud." (Opp'n 9 (emphasis added).)

While New York courts have suggested that this species of equitable tolling may be meritless, *see*, *e.g., Zumpano*, 849 N.E.2d at 930 (rejecting equitable tolling claim because there was no "new separate and subsequent acts of wrongdoing" beyond those "alleged" to have occurred decades before the instant action), federal courts, applying the federal equitable tolling doctrine, have more explicitly held that "[t]he law does not permit equitable tolling when a party simply did not realize the 'extent' of his claim."  *Ruso v. Morrison*, 695 F. Supp. 2d 33, 46 (S.D.N.Y. 2010); *cf. Paige v. Police Dep't of City of Schenectady,* 264 F.3d 197, 200 (2d Cir. 2001) ("Although some of the facts putatively concealed by the defendants might have strengthened [the plaintiff's] case by corroborating her story, . . . the absence of those facts did not sufficiently justify [the plaintiff's failure to] pursu[e] her cause of action as to merit equitable tolling."); *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998) ("[A] plaintiff need not know each and every relevant fact of his injury . . . .  Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect

*Weiner*, 717 F. Supp. 77, 80 (S.D.N.Y. 1989) (refusing to apply continuing wrong doctrine where damages continued to accrue from an initial fraud due to subsequent rent payments).

himself by seeking legal advice."); *Statistical Phone Philly* 116 F. Supp. 2d at 482 (rejecting the

plaintiff's plea for equitable tolling, noting that the plaintiffs "failed to show that [the

defendants'] concealment prevented their discovery of the *nature* of their claim," and that "[t]he

fact that [the] plaintiffs may not have had all the facts pertinent to their claims is of no

consequence" because "[t]he question is whether plaintiff knew enough to sue" (emphasis

added)).  Because Plaintiff, by his own admission, already had knowledge that he allegedly had

been defrauded as of, at latest, 1989, there is no basis for equitably tolling the statute of

limitations.  *See Ruso*, 695 F. Supp. 2d at 46–48 (rejecting application of equitable tolling

because plaintiff was "on notice" that he may have been defrauded when, for example, he

"threatened to sue" the defendant over two years before he alleged to have learned the extent of

the fraud (internal quotation marks omitted)).

       b.  <u>Open Repudiation</u>

     Under New York law, the open repudiation doctrine provides that "the limitations period

for claims arising out of a fiduciary relationship does not commence until the fiduciary has

openly repudiated his or her obligation or the relationship has been otherwise terminated."[20]

*Golden Pac. Bancorp*, 273 F.3d at 518 (internal quotation marks omitted); *see also Westchester*

*Religious Inst. v. Kamerman*, 691 N.Y.S.2d 502, 503 (N.Y. App. Div. 1999) (noting that in "an

action for breach of a fiduciary relationship," the statute of limitations "does not begin to run

until the fiduciary has openly repudiated his or her obligation or the relationship has otherwise

been terminated," and finding the plaintiff's claim timely on those grounds); *cf. Matter of Behr*,

594 N.Y.S.2d 314, 315 (N.Y. App. Div. 1993) ("For a trustee to invoke a Statute of Limitations

---

[20] A "judicial settlement of the fiduciary's account" also starts the statute of limitations
for claims arising out of a fiduciary relationship, *Evangelista v. Mattone*, 844 N.Y.S.2d 74, 75
(N.Y. App. Div. 2007), but it no Party has asserted that settlement has occurred in this case.

defense, a mere lapse of time is insufficient without proof of an open repudiation." (citing *Matter of Barabash*, 286 N.E.2d 268) (second citation omitted)).  An open repudiation must be "clear and made known to the plaintiff," *Evangelista v. Mattone*, 844 N.Y.S.2d 74, 75 (N.Y. App. Div. 2007); *see also In re Meyer*, 757 N.Y.S.2d 98, 99 (N.Y. App. Div. 2003) (same); *In re Velsor's Estate*, 243 N.Y.S.2d 477, 478 (N.Y. Sur. Ct. 1963) (noting that "[a]cts which have been held to be sufficient to support a repudiation" must be "unequivocal," and that "proof of repudiation [must be] clear and satisfactory"), though such repudiation need not be accomplished by virtue of an explicit statement of repudiation from the fiduciary, *see, e.g., Trafalgar Power, Inc. v. U.S. Bank Nat. Ass'n*, No. 05-CV-15333, 2012 WL 555044, at *10 (N.D.N.Y. Feb. 21, 2012) (finding that there was an open repudiation when the defendant bank "stopped making disbursements" pursuant to formal requests from the operator of the plaintiff corporation's power plants, and when the president of the plaintiff corporation indicated in a deposition that "he no longer placed trust in the [b]ank, and he felt the [b]ank had breached its fiduciary duty" and sent the bank a letter threatening to sue for breach of that duty).  It is the burden of the party "seeking the benefit of the Statute of Limitations defense" to prove that an open repudiation has occurred.  *In re Rodken*, 705 N.Y.S.2d 429, 430 (N.Y. App. Div. 2000).[21]

    As Defendants contend in their supplemental letter brief, (*see* Letter from Brian D. Caplan, Esq., to Court (Dec. 19, 2014) ("Defs.' Dec. 19, 2014 Letter") at unnumbered 1–2 (Dkt.

---

[21] The open repudiation doctrine applies only apply to claims for equitable relief, and not to claims for money damages.  *See Kaszirer v. Kaszirer*, 730 N.Y.S.2d 87, 88 (N.Y. App. Div. 2001) ("[T]he requirement of a clear repudiation applies only to claims seeking an accounting or other equitable relief."); *see also Bd. of Trustees ex rel. Gen . Ret. Sys. of Detroit v. BNY Mellon, N.A.*, No. 11-CV-6345, 2012 WL 3930112, at *9 (S.D.N.Y. Sept. 10, 2012) ("[T]he open repudiation doctrine is inapplicable to [the] [p]laintiff's claim because the doctrine only applies to the six-year statute of limitations for equitable relief—not the three-year period for monetary damages.").  Therefore, only Plaintiffs claims for equitable relief—e.g., his claims for an accounting and constructive trust—may be rendered timely by operation of the doctrine.

No. 21)), the open repudiation doctrine exists to "protect beneficiaries in the event of breaches of duty by fiduciaries such as estate administrators, trustees, corporate officers, and receivers, that is, in circumstances in which the beneficiaries would otherwise have no reason to know that the fiduciary was no longer acting in that capacity." *Access Point Med., LLC v. Mandell*, 963 N.Y.S.2d 44, 47 (N.Y. App. Div. 2013).  Put another way, "a person should be able to rely on the fiduciary's skill without the necessity of interrupting a continuous relationship of trust and confidence by instituting suit." *White v. Fee*, 953 N.Y.S.2d 554, 2012 N.Y. Slip Op. 51133(U), at *23 (N.Y. Sup. Ct. June 7, 2012) (citing *People v. Ben,* 866 N.Y.S.2d 464, 465–66 (N.Y. App. Div. 2008) and *Kamerman,* 691 N.Y.S.2d at 503)); *see also Golden Pac. Bancorp*, 273 F.3d at 519 (same).

While Plaintiff does not argue that the open repudiation doctrine applies to this case in his Opposition, the Court ordered supplemental briefing to determine if the doctrine rendered any of Plaintiff's claims timely.  (*See* Dkt. No. 18.)  Having reviewed the Parties' letter briefs, the Court agrees with Defendants that "Plaintiff cannot reasonably claim that he was unaware of the facts purportedly showing . . . Lederman's repudiation of his purported fiduciary obligations," and that therefore Plaintiff's claims are not saved by the open repudiation doctrine.  (Defs.' Dec. 19, 2014 Letter at unnumbered 2).  Plaintiff had ample reason to believe that Defendants had repudiated their fiduciary duties when he learned that he was not receiving payments to which Plaintiff alleges he was entitled, and he manifested such a belief when he filed suit against Defendants in 1989.  *See Lake Erie Distribs., Inc. v. Martlet Importing Co.*, 634 N.Y.S.2d 599, 601 (N.Y. App. Div. 1995) ("The commencement by [the] plaintiff of its lawsuit was an objective expression of [the] plaintiff's intent to treat [the defendant's] repudiation as a final breach of the franchise agreement."); *cf. Trafalgar Power*, 2012 WL 555044, at *10 (finding that

there was an open repudiation when [the] [d]efendant bank "stopped making disbursements" pursuant to formal requests from the operator of the plaintiff corporation's power plants, and when the president of the plaintiff corporation indicated in a deposition that "he no longer placed trust in the [b]ank, and he felt the [b]ank had breached its fiduciary duty" and sent the bank a letter threatening to sue for breach of that duty).[22]  Moreover, because Plaintiff filed that lawsuit, it is clear that he was in no way "prevented from timely filing an action due to reasonable reliance" on the fiduciary relationship.  *White*, 2012 N.Y. Slip. Op. 51133(U), at *23 (finding "no basis for tolling the statute of limitations" because the defendants "repudiated their fiduciary relationship at the time they performed [their] allegedly bad acts," and because the plaintiffs were not "actively misled by [the] [d]efendants from filing suit or that [the] [p]laintiffs were in some extraordinary way prevented from complying with the limitations period" (citations and internal quotation marks omitted)).[23]  Therefore, the Court finds that the open repudiation doctrine is inoperable in this case because as of, at the latest, the filing of Plaintiff's New York Supreme Court lawsuit in 1989, Plaintiff had no reason to rely on the actions of the Defendants as fiduciaries.  Plaintiff's claims thus remain untimely.

---

[22] Additionally, because repudiation occurs when a fiduciary "asserts and exercises individual ownership over the . . . property" subject to the fiduciary duty, Defendants may have openly repudiated when Plaintiff first learned that they converted the assets to which Plaintiff claims he is entitled.  *Matter of Will of Zilkha*, 570 N.Y.S.2d 807, 810 (N.Y. App. Div. 1991); *see also Nobile v. Schwartz,* 265 F. Supp. 2d 282, 289 (S.D.N.Y. 2003) (same); *Matter of Griffin*, 170 Misc. 1066, 1067 (N.Y. Sur. Ct. 1939) (finding that the statute of limitations under the open repudiation doctrine begins to run "from the time of disclosure to the beneficiary that the wrong had been committed").

[23] Plaintiff alleges in his letter brief that Defendants' fiduciary obligations "ha[ve] not ceased," (Letter from Pl. to Court (Dec. 18, 2014) at 1 (Dkt. No. 23)), and that he is still owed revenue from, for example, "Urgent's two albums created [between] 1984 [and] 1987," (*id.* at 3). These allegations relate to the scope of relief to which Plaintiff would be entitled were the Court to determine that Defendants had a continued fiduciary duty, rather than to whether or not that fiduciary duty has been repudiated.

2.  Futility

Having determined that Plaintiff's claims are time-barred, the Court must determine

whether it should grant Plaintiff leave to amend the Complaint.  "Generally, leave to amend

should be freely given, and a pro se litigant in particular should be afforded every reasonable

opportunity to demonstrate that he has a valid claim."  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir.

2014) (internal quotation marks omitted).  "A pro se complaint should not be dismissed without

the Court granting leave to amend at least once when a liberal reading of the complaint gives any

indication that a valid claim might be stated."  *Id.* (internal quotation marks omitted).  The

decision of whether to grant or deny leave to amend is, however, governed by the "sound

discretion of the district court," such that the district court may deny leave "for good reason,

including futility."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see*

*also Tocker v. Philip Morris Cos., Inc.*, 470 F.3d 481, 491 (2d Cir. 2006) (noting that "leave to

amend a complaint may be denied when amendment would be futile").

Plaintiff, in his Motion To Amend, represents that his proposed amendment establishes

that "the revenue stream of royalties" at issue "was still continuing up past the date of the initial

filing of this . . . action."  (Pl.'s Mot. for Leave To File [an] Amended Complaint (Apr. 22, 2014)

("Mot. To Amend") at unnumbered 2 (Dkt. No. 17).)  As the preceding section of this Opinion

makes clear, however, while Plaintiff's proposed amendment may concern "newly discovered

information that was not available at the time of [Plaintiff's] initial filing," (*id.*), it does not cure

the underlying issue with Plaintiff's claims—that they are time-barred—because it only refers

the extent of damages from the alleged fraud at issue.  *See Foster v. N.Y.C. Prob. Dep't*, No. 11-

CV-4732, 2013 WL 1342259, at *3 (E.D.N.Y Mar. 7, 2013), *adopted by* 2013 WL 1305775

(E.D.N.Y Mar. 30, 2013) (holding that "amendment . . . would be futile because [the] plaintiff's .

. . claim . . . would be barred by the statute of limitations."); *Brandon v. Musoff*, No. 10-CV-9017, 2012 WL 135592, at *4, *6 (S.D.N.Y. Jan. 17, 2012) (dismissing complaint with prejudice where amendment would be futile because plaintiff's claim was "time-barred").   Other than by reference to facts discovered from the Cleveland Action that Plaintiff has not yet included in his pleadings, the Court cannot conceive of any amendment that would justify equitable tolling of the statute of limitations in this case, and Plaintiff already had an opportunity to amend when filing his proposed Amended Complaint.  The Court therefore denies Plaintiff's Motion To Amend as futile, except insofar as Plaintiff wishes to amend his Amended Complaint to address the relevance of the Cleveland Action to his equitable tolling argument.

### III.  CONCLUSION

In light of the foregoing, the Court dismisses Plaintiff's Amended Complaint and denies Plaintiff's Motion To Amend.  The dismissal is without prejudice only insofar as Plaintiff is given 30 days to submit a Second Amended Complaint, amending only to address the issue of the relevance of the Cleveland Action.  No extensions will be granted.  Plaintiff is reminded to plead the fraud "with particularity" in accordance with Federal Rule of Civil Procedure 9(b). The Clerk of Court is respectfully requested to terminate the pending Motions.  (*See* Dkt. Nos. 11, 16, 17.)

SO ORDERED.

Dated:        January 23, 2015
              White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE